# UNITED STATES DISTRICT COURT

for the

District of Nebraska

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or*<br>*identify the person by name and address)*<br><br>See Attachment A.See Attachment A. | )<br>)<br>)  Case No.  8:19MJ558<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Nebraska _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Controlled substance conspiracy |

The application is based on these facts:

See Attached Affidavit in Support of an Application for a Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Amy B. Blackburn, AUSA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **11/20/2019**

_____
*Judge's signature*

City and state:    Omaha, Nebraska

Michael D. Nelson, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

IN THE MATTER OF THE SEARCH OF
FIVE CELLULAR TELEPHONES:

1.      Silver Apple iPhone;
2.      Silver Apple iPhone S;
3.      White Apple iPhone;
4.      Silver Apple iPhone S;
5.      Black Apple iPhone
6.      Silver Apple iPhone

8:19MJ558

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH
WARRANT

I, Investigator Jessica Wenzl #686, Nebraska State Patrol, being first duly sworn, hereby depose and state as follows:

1.      I am a Nebraska State Patrol Investigator who has been employed by the Nebraska State Patrol for 16 years and have been assigned to the Investigative Services Division for the last 13 years.  I have received routine narcotics-related training during basic and in-service training programs, as well as on the job training.  I have also participated in and completed specialized training such as Search & Seizure, Commercial Motor Vehicle Drug Interdiction, Criminal and Drug Interdiction, Kinesic Interview (Roadside, Level I, & Level II), DEA Basic Narcotic Investigations, Cell Phone Technology in Criminal Investigations, Conspiracies: Development and Management, Behavioral Threat Assessment, Forensic Experiential Trauma Interviewing. These trainings incorporated observation and identification of controlled substances, drug paraphernalia, equipment, tools, and technology used to manufacture, distribute, dispense, inhale, inject and/or ingest controlled substances, and familiarity with related customary and usual narcotics practices.

2.      These aforementioned law enforcement service and specialized training also dealt with the sale, packaging, recognition, drug concealment and storage, methods of operation, drug currency, communications / technology, and record keeping by users and distributors of controlled substances.  I have had the opportunity to conduct, coordinate and/or participate in investigations relating to all types of crimes to include, but not limited to investigations and arrests for controlled substance possession, distribution, and conspiracy to violate drug statute offenses.

3.      I have just and reasonable grounds to believe and do believe, that five digital/electronic devices (the Property) contain evidence of criminal activity related to narcotics violations, to include drug proceeds, in violation of 21 U.S.C. § 841(a).  The Property is described as follows:

1.      Silver Apple iPhone with IMEI 356153093266804; and
2.      Silver Apple iPhone S with IC 579CE2944A; and
3.      White Apple iPhone with no identifying information accessible; and
4.      Silver Apple iPhone S with IC 579CE2946A;

5. Black Apple iPhone with no identifying information accessible; and,
6. Silver Apple iPhone with IC 579CE2946A.

4.     The Property is currently located in the evidence storage of the Nebraska State Patrol, 4130 NW 37th Street, Lincoln, Lancaster County, Nebraska.

5.     The information contained within this affidavit is based upon information I have gained from my investigation, my personal observations, my training and experience, and/or information provided to me by other law enforcement officers and/or agents.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  The following paragraphs set out the probable cause to believe that the Property contain evidence of criminal activity and thereby provide grounds for issuance of a search warrant.

6.     On June 18, 2019, at approximately 1157 hours, Trooper Rob Pelster saw a silver Chevrolet Suburban driving in excess of the 65 mph speed limit in the middle lane of westbound I-80.  Trp. Pelster used his radar unit and recorded a reading of 71 mph.

7.     Trp. Pelster caught up to the Suburban at mile marker 403 and saw the Suburban pull in behind a maroon sedan at an unsafe distance, getting as close as two (2) car-lengths behind the sedan before braking and backing off.  Trp. Pelster took several stopwatch readings on the following distance, ranging from .5 - .8 of a second.  As a result, Trp. Pelster made a traffic stop on the Chevrolet Suburban bearing Illinois BK34159 at mile marker 398.

8.     Trp. Pelster approached the passenger side of the Suburban, greeted the two male occupants, and explained the reason for the stop.  The driver provided his Illinois driver's license that showed his identifying information as: Ali M. Abbasi, DOB 12/10/1975.  The passenger also showed Trp. Pelster his Illinois driver's license that showed his identifying information as: Julio J. Martinez, DOB 11/05/1973.

9.     In plain sight, Trp. Pelster saw a touch screen cell phone in GPS mode plugged into the USB port and sitting in the center console.  That phone and another touch screen cell phone used by Abbasi during the traffic stop were identified as belonging to Abbasi.  Trp. Pelster also saw Martinez using a touch screen phone during the stop, and that Martinez also had a second phone sitting on his lap.

10.     Trp. Pelster noted that Abbasi was wearing a New York City Fire Department jacket with his name on it.  Trp. Pelster saw that Abbasi's hands were shaking while handing over the requested documents, and made a verbal note of the same.  Trp. Pelster asked Abbasi back to the patrol unit where he would be issued a warning for speeding.

11.     In the patrol car, Trp. Pelster engaged in conversation with Abbasi as he ran his records checks.  Abbasi claimed that he was a volunteer for the NYFD approximately 1 ½ years prior, and said that he had a limo business in Chicago, IL.  Trp. Pelster asked Abbasi who the passenger was, and Abbasi identified him as "Peto Hernandez."  This caused Trp. Pelster to

become more suspicious of the pair because the passenger's Illinois driver's license showed his name as "Julio J. Martinez."

12.     Abbasi said they were traveling to Las Vegas, NV and would be there "as long as (they) could survive".  Abbasi then said that they might be in Vegas for a week.  Trp. Pelster noted that Abbasi had rented the Suburban in Chicago at 1415 on June 17, and it was due back to Chicago at 1400 on June 21.  A four-day car rental is inconsistent with traveling to Las Vegas and gambling for a week.  Abbasi stated they'd decided to go to Las Vegas only the day prior.

13.     While Lincoln Communications ran checks, Trp. Pelster left the patrol car and approached Martinez in the Suburban.  Trp. Pelster saw that Martinez was on FaceTime with a female whom he identified as his fiancée.  Martinez said that the trip to Las Vegas had been planned for a while.

14.     As a result to the foregoing information, and based on his training and experience as a law enforcement officer, Trp. Pelster believed the following indicated criminal activity when taken as a totality during the scope of the stop:

- •Coming from a distribution city (Chicago, IL);
- •Traveling to a transportation hub (Las Vegas, NV);
- •Large rental vehicle for two people;
- •Excessive nervousness that did not subside throughout the entire traffic stop (Abbasi had a rapid/visible heartrate);
- •Disclaimer (Abbasi was wearing a NYFD jacket);
- •Abbasi did not know the passenger's actual name;
- •Discrepancies in stories (Abbasi said the trip to Vegas had been planned the day prior, but Martinez said that it had been planned for a while).

15.     At 1236 hours, Trp. Pelster gave Abbasi all of his documents and issued an electronic warning for speeding.  As Abbasi began to exit the patrol unit Trp. Pelster asked Abbasi if they could speak further, and Abbasi agreed to the request.

16.     Abbasi denied being in possession of or transporting drugs, guns, or contraband.  Trp. Pelster specifically asked Abbasi if there was a large amount of U.S. currency in the Suburban, and Abbasi stated there was not.

17.     Based on Trp. Pelster's training and experience, he believed there to be a large amount of drug proceeds in the Suburban.  As a result Trp. Pelster requested consent to search the rented Suburban.  Abbasi denied consent to search and also would not consent to remain at the traffic stop until a K9 could be deployed on the Suburban.

18.     After Abbasi denied consent to search, Trp. Pelster called for a K9 and, due to the aforementioned indicators of criminal activity when taken as a totality, Trp. Pelster detained Abbasi.

19.     Trp. Pelster approached Martinez, still seated inside the Suburban.  Martinez also claimed that there was nothing illegal in the Suburban, denied being in possession of a large amount of currency, and denied that there was a large amount of currency in the Suburban.

20.     Martinez granted Trp. Pelster consent to search his property.  Trp. Pelster explained to Martinez that a K9 had been summoned to the traffic stop to conduct a sniff on the Suburban, and Martinez replied, "Okay."

21.     Trp. Pelster placed Martinez inside his patrol unit with Abbasi.

22.     Lancaster County K9 Sgt. Jason Mayo, #902119, was the first K9 officer in the area to become available.  At 1305 hours, Sgt. Mayo arrived at the stop and deployed his K9, which indicated to the odor of drugs emitting from within the Suburban.

23.     Law enforcement conducted a probable cause search of the Suburban.  The search revealed a large, heat-sealed package of rubber-banded U.S. currency was located in the rear quarter panel on the driver's side.  This type of concealment and manner of packaging is consistent with multiple other drug currency cases Trp. Pelster has conducted over the course of his 20-year career.  Several of these involved contraband (including drug currency) concealed in the rear quarter panels of vehicles.

24.     Law enforcement located another phone in Martinez's backpack, along with personal use marijuana products, and an additional rubber-banded bundle of U.S. currency totaling $10,000, which was also seized.  The estimated amount of suspected drug proceeds seized from the rear quarter panel was $100,000.  Law enforcement seized all phones (the "seized Property") that were in the Suburban and placed them into evidence.

25.     Law enforcement detained Abbasi and Martinez and transported them to the Headquarters Patrol Office to further the investigation.

26.     At the Headquarters Patrol Office, Trp. Pelster briefed your Affiant regarding the stop and investigation and gave Abbasi's operator's license to your Affiant.

27.     Your Affiant went to the interview room to talk to Abbasi.  Your Affiant told Abbasi that Trp. Pelster told her (Wenzl) that Abbasi claimed he did not know there was any money concealed in the Suburban (rented by Abbasi).  Abbasi stated he did not know there was money concealed in the Suburban.

28.     Your Affiant read the Nebraska State Patrol Advice of Rights (Form NSP708) to Abbasi.  Abbasi stated he wanted a lawyer present and would not answer any questions without a lawyer.  Upon concluding the interview, Abbasi freely volunteered information regarding a limo company he owned.  Abbasi said he started the limo company over 15 years ago, and also said that he owned restaurants.  Abbasi also said it was the wrong day to wear the fleece jacket he was wearing, that displayed a New York City Fire Department logo and his name.  Your Affiant asked if Abbasi was a firefighter and Abbasi replied that he volunteered for several years.  Your Affiant told Abbasi that he should be proud of his service to which Abbasi seemed to scoff.

29.     Abbasi was placed in the holding room where Martinez had been and Martinez was then escorted into the Interview Room.

30.     Your Affiant then talked to "Julio" J Martinez (as indicated on his operator's license). Your Affiant thought Martinez seemed quite sluggish so your Affiant asked Martinez if he was okay.  Martinez said he needed his blood pressure and diabetes medication and provided instructions on where to find the medications in his belongings.  Your Affiant retrieved the medications for Martinez who quickly took three different medications.

31.     Your Affiant told Martinez that Trp. Pelster told her (Wenzl) that Martinez had claimed that he did not know there was any money concealed within the Suburban.  Martinez stated he did not know there was money concealed in the Suburban.  Your Affiant then read the Nebraska State Patrol Advice of Right (Form NSP708) to Martinez.  Martinez' response was to express that he was upset that he was being held without being able to make a phone call and claimed that he did not even know where he was (name of the city)  Your Affiant attempted to explain what was happening to Martinez, but Martinez specifically stated he would not answer any questions without an attorney present.  Martinez asked to use the restroom, and as he was walking to the restroom, your Affiant saw that Martinez was walking in a slow, stiff, deliberate manner.  Martinez said he needed to go back to driving but said he was not an over the road truck driver, just a local driver.

32.     Trp. Pelster determined that Abbasi and Martinez were going to be released but that much of the property they had in their possession was going to be seized pending investigation. Abbasi was very cooperative and did not contest the decision in your Affiant's presence. Martinez, however, wanted his phone and was verbally displeased about not being able to leave with it.  Martinez was then provided a backpack that belonged to him.  Martinez immediately asked where his money was and how he was supposed to get home.  Trp. Adam Strode informed Martinez that there was still several hundred dollars in his wallet, to which Martinez stated that he always has several hundred dollars in his wallet.  Martinez was upset that his ipad and his Beats headphones were not in his backpack.  Trooper Brandon Wilkie told Martinez that both items were left in the rental vehicle.  Martinez voiced his dismay that he would also not be able to have his CBD/oil products and informed that he uses them for his knees.

33.     Trp. Pelster also seized the GPS tracking device located in the center console of the Suburban.  It should be noted that Abbasi and Martinez repeatedly denied ownership or knowledge of the U.S. currency located in the rented Suburban.

34.     The official bank count was conducted on June 21, 2019.  The total amount of U.S. Currency seized was $110,000.

35.     As set forth above, there is probable cause to believe that some of the data and information for which this affidavit seeks authority to search is generated or stored in the Property, as listed and described in **Attachment A**, and will reveal evidence of the distribution of illegal controlled substances, the use or transportation of proceeds of such substances, or other similar criminal enterprises.

36.    Digital media/devices and cellular/mobile phones can contain a substantial amount of information relevant to the investigation of a case, including evidence establishing ownership of the devices, involvement in criminal activity and ownership or use of any internet service accounts, social media accounts, cloud storage accounts, email accounts, credit card accounts, telephone accounts, correspondence and other identification documents.  Criminals often use digital device/media to communicate with accomplices and will sometimes store accomplices' contact information in a digital format.  These communications can occur through electronic mail (e-mail), instant messaging/text messaging, social media accounts, cloud storage accounts, and/or phone calls.

37.    More specifically, due to the nature of drug trafficking, those engaging in these activities are often unable to have direct, in person discussions and negotiations.  As a result, a narcotic distribution structure of any size will use computers/equipment, cell phones, and digital media for the purpose of contacting sources and distributors from the top of the pyramid to the base of the pyramid and vice versa to discuss openly or in cryptic fashion the supply, cost, quality, distribution, transportation, or payments involved in marketing and distributing narcotics. Further, when a personal meeting between individuals takes place, cell phones and digital media is often used to arrange and verify the actual meeting.

38.    **Attachment A** lists the five cellular telephones (the Property) to be searched.  Law enforcement requests a warrant to search the Property for evidence, including the following items, data and information, for law enforcement to seize:

1.  Phone Books/Contacts/Friends List/Friends - Individuals use these types of contacts, in addition to legitimate purposes, to store phone numbers, names, and other information such as addresses, email addresses, instant messenger contact name(s), home and work addresses, and other information for contacting the corresponding individuals.  This information is invaluable to establish conspirators, co-conspirators, and witnesses.  Contact information can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, emails, social networking accounts and cloud storage accounts.

2.  Recent Calls/Call History - Individuals can use recent calls and call history on a device, in addition to legitimate purposes, to store phone numbers, names, and other information such as email addresses, instant messenger contact name(s), and other information for contacting the corresponding individuals.  Your affiant knows that recent calls and call history information can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, emails, text messaging, picture messaging, social networking accounts and cloud storage accounts.  The call history can contain detailed records for dialed/sent calls and received calls which can be compared to subpoenaed records from telecommunication providers.

3.  Maps/Location Services/GPS - Individuals use maps, location services, and GPS (factory installed and user installed), in addition to legitimate purposes, to identify,

locate and document travel histories and points of interest on the devices.  The documentation can occur via default installed mapping applications, devices' operating system default settings, or user installed mapping applications.  The mapping application or settings may be documented within the specific application and also documented, linked, synced or associated with the devices. Maps, location services, and GPS can contain a detailed location history of the computer, computer equipment, cellular phone or digital media.  Individuals can manually save specific points of interest as a favorite location (such as their home) and can permanently or temporarily save recently visited locations.  Devices can also attach location services data to, include but not limited to, photographs, videos, social media accounts, and cloud storage accounts.  This information can establish conspirators, co-conspirators, and witnesses.  Location services can contain a substantial amount of digital information and documentation regarding the location of a crime or a timeline history during the commission of one or several criminal acts.  Location services data has been used in all aspects of criminal investigations to establish where conspirators, co-conspirators, and witnesses were located during an investigation.

4. Emails – Individuals use email accounts, in addition to legitimate purposes, to send messages, store phone numbers, names, and other information such as addresses, email addresses, instant messenger contact name(s), home and work addresses, and other information for contacting the corresponding individuals.  This information can also establish conspirators, co-conspirators, and witnesses. Electronic mail accounts can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, contact lists, social networking accounts and cloud storage accounts.  Individuals will create fake email accounts to avoid revealing their true identity during an investigation.  E-mails can contain attachments, including but not limited to photographs and videos, that are linked, synced, or associated with other lists or databases of the devices.

5. Calendars – Individuals use calendars, in addition to legitimate purposes, to store meetings, appointments, scheduled tasks.  The calendar meetings, appointments, and scheduled tasks can include identifying information such as phone numbers, names, and other information such as addresses, email addresses, instant messenger contact name(s), home and work addresses, and other information for contacting the corresponding individuals.  This information can establish conspirators, co-conspirators, and witnesses.  Calendars can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, emails, contact lists, social networking accounts and cloud storage accounts. Individuals can keep track of meetings, appointments, and scheduled tasks and document those activities in a calendar style database or application.

6. Applications – Individuals use applications (factory installed and user installed), in addition to legitimate purposes, to communicate with individuals and store digital data.  The communication can occur via voice, text message, instant message, picture message, or video conference, and copies of the voice or text communication may be documented within the specific application and also documented, linked, synced or

associated with the devices. Applications that store digital data, including but not limited to, text, emails, photographs, videos, and emails, can be used to backup data located on the devices. These backups can contain current and historical evidence of a crime. Applications interact with the computer, computer equipment, cellular phone or digital media and can be used to link, sync, or associate digital data with social media accounts and cloud storage accounts. Applications can be used to hide digital data, such as photographs, videos and text, to avoid detection during an investigation. This information can establish conspirators, co-conspirators, and witnesses. Messaging services within applications can contain a substantial amount of digital information and communication documentation.

7. Messages - Individuals use message features and messaging accounts, in addition to legitimate purposes, to communicate with individuals. The message feature and/or message account can contain text and/or embedded photographs, videos, and voice memos. The message feature or message accounts can contain phone numbers, names, and other information such as addresses, email addresses, instant messenger contact name(s), home and work addresses, and other information for contacting corresponding individuals. This information can establish conspirators, co-conspirators, and witnesses. Message features and messaging accounts can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, emails, calendars, applications, contact lists, social networking accounts and cloud storage accounts. Individuals will use applications to communicate with conspirators, co-conspirators, and witnesses during an investigation to avoid using traditional short message service (SMS) or multimedia message service (MMS).

8. Voicemails/Voice Memos - Individuals use voice features and voice messaging accounts, in addition to legitimate purposes, to communicate with individuals. The voice feature and/or voice message account can contain speech-to-text, audio, and voice memos. The voice feature and/or voice message accounts can contain phone numbers, names, and other information such as addresses, email addresses, instant messenger contact name(s), home and work addresses, and other information for contacting corresponding individuals. This information may be retained temporarily or indefinitely depending on the type of voice message service (visual voicemail or traditional voicemail), and this information may automatically be translated into a text file or similar file by use of an application. This information can establish conspirators, co-conspirators, and witnesses. Your affiant knows that voice features and voice messaging accounts can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, emails, calendars, applications, contact lists, social networking accounts and cloud storage accounts. Individuals can send a voice message to another individual without actually calling the individual. Voice features and voice messaging accounts can store voice memos to document a conspirators, co-conspirators, and witnesses activities and locations during criminal activity.

9. Photographs/Videos – Individuals use photographs and videos, in addition to legitimate purposes, to communicate with individuals and to document several aspects of criminal activity. Photographs and videos can contain metadata and other data that provide time, date, location and the type of device used for the respective photograph and/or video. This information can establish conspirators, co-conspirators, and witnesses. Photographs and videos can be linked, synced and associated with other lists or databases of the devices, to include but not limited to, photographs, videos, emails, calendars, applications, contact lists, social networking accounts and cloud storage accounts. Individuals send/receive, upload/download photographs and videos to document activities of conspirators, co-conspirators, and witnesses. Photographs and videos can link several conspirators, co-conspirators, and witnesses to criminal activity because those conspirators, co-conspirators, and witnesses are present in a photograph or video.

10. Social Media Accounts/Cloud Storage Accounts - Individuals use social media accounts and/or cloud storage accounts, in addition to legitimate purposes, to communicate with individuals and store digital data. The communication can occur via voice, text message, instant message, picture message, emails, or video conference, and copies of the voice or text communication may be documented within the social media account and/or cloud storage account and also documented, linked, synced or associated with the computer, computer equipment, cellular phone or digital media. Social media accounts and/or cloud storage accounts can be accessed via a traditional computer setup via the Internet, mobile device such as a cellular phone or tablet, or an application installed on a computer, computer equipment, cellular phone or digital media. Social media accounts and/or cloud storage accounts can contain digital data, including but not limited to, text, emails, contacts, calendars, photographs, videos, and emails, and can be used to backup data located on the devices. Social media accounts and/or cloud storage accounts can be linked, synced, or associated with one or several devices. Several devices can be synced with one or several social media accounts and/or cloud storage accounts to ensure all synced devices contain "updated" and/or "real-time" information, including but not limited to, photographs, videos, emails, contact lists, voicemails, calendars, and applications. This information can establish conspirators, co-conspirators, and witnesses. Social media accounts and/or cloud storage accounts, with or without the use of an application, can be used to evade detection during an investigation by storing digital data in another location.

11. Internet History - Individuals use web browsers and/or applications, in addition to legitimate purposes, to communicate with individuals, store digital data, and conduct online browsing and research. Using web browsers or applications to access the Internet creates an Internet history. As is the case with most digital technology, communications by way of computer, computer equipment, cellular phone or digital media can be saved or stored on the devices. Storing this information can be intentional, i.e., by saving an email as a file on the device or saving the location of one's favorite website. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in

many places (e.g., temporary files or Internet Service Provider client software, among others).  In addition to electronic communications, a device's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser and/or application used.  A forensic examiner can often recover evidence which shows that a device was used to share files, and even some of the files which were uploaded or downloaded.  Such information may be maintained indefinitely until overwritten by other data.  The Internet history can also contain information, including but not limited to, account passwords, email addresses, and search terms. This information can establish conspirators, co-conspirators, and witnesses.

39.    The data and information contained in the seized Property will serve a number of evidentiary purposes, including:

1. evidence of Abbasi and/or Martinez's knowledge of the illegal drug proceeds/funds contained within the Suburban rented by Abbasi;
2. intent to participate in the distribution of drugs and transportation of drug proceeds;
3. identify associates, co-conspirators and communicates to determine additional individual(s) who are involved in the distribution chain and/or currency transportation;
4. identify routes of travel and locations visited to identify others involved in distribution and/or currency transfer; and
5. detail the data in the phones to show who used the devices;
6. use of the device in the distribution of illegal controlled substances and other criminal enterprises, including interstate transportation of drug proceeds.

40.    The Nebraska State Patrol Technical Crimes Division and/or other law enforcement officers/entities will aid in the search and seizure of the Property.  Indeed, the recovery of data by a computer forensic analyst takes significant time, requiring a submission to be forensically analyzed in a laboratory, computers/equipment, cellular phones, and digital media also undergo a similar process.  For this reason, the "Return" inventory, unless otherwise ordered by the Court, will not include evidence as examined by a forensic analyst but will provide specific information detailing the submittal of the request for analysis by the Nebraska State Patrol Technical Crimes Division.  During the course of the search, photographs of the searched items may also be taken to record the condition thereof and/or the location of items, information and data therein.

41.     This warrant seeks only permission to examine the Property already in law enforcement's possession; thus the execution of this warrant does not involve the physical intrusion onto a premises.  A warrant authorizing a day time search is requested.

WHEREFORE, I pray that a Search Warrant may issue according to law.

FURTHER AFFIANT SAYETH NAUGHT.

Dated this ⟨20⟩ day of November, 2019.


_____
Jessica Wenzl #686
Investigator, Nebraska State Patrol


Sworn to before me by telephone or other reliable electronic means this ⟨20⟩ day of November, 2019.


_____
Michael D. Nelson
UNITED STATES MAGISTRATE JUDGE


IG-19-0072 Martinez Page 11

## ATTACHMENT A

The five cellular/mobile phones/devices (the Property) to be searched are as follows:

1. Silver Apple iPhone with IMEI 356153093266804; and
2. Silver Apple iPhone S with IC 579CE2944A; and
3. White Apple iPhone with no identifying information accessible; and
4. Silver Apple iPhone S with IC 579CE2946A; and
5. Black Apple iPhone with no identifying information accessible
6. Silver Apple iPhone with IC 579CE2946A.

The phones/devices are currently located at the evidence storage of the Nebraska State Patrol, 4130 NW 37th Street, Lincoln, Lancaster County, Nebraska.

This warrant authorizes the forensic examination of the Property for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records, information and data on the phones/devices described in Attachment A (the Property) that relate to violations of 21 U.S.C. § 841(a) and involve Ali M. Abbasi and/or Julio J. Martinez, including:

   a.   lists of customers and related identifying information;

   b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d.   any information recording Ali M. Abbasi and/or Julio J. Martinez's schedule or travel;

   e.   all bank records, checks, credit card bills, account information, and other financial records.

2.      Any and all electronic data contained in the devices, including data, text, messages, images, voice memos, photographs, videos, internet sites, internet access, documents, emails and email accounts, social media accounts, cloud storage accounts, or other information, ledgers, contained in the cellular phone internal, external or removable memory or memories, which includes any smart cards, SIM cards or flash cards.

3.      Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Nebraska

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No.   8:19MJ558 |
| See Attachment A. | ) ) ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Nebraska_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attached Affidavit in Support of an Application for a Search Warrant.

**YOU ARE COMMANDED** to execute this warrant on or before     December 3, 2019     *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   11/20/2019 11:28 a.m.        [signature]
                                                              *Judge's signature*

City and state:     Omaha, Nebraska          Michael D. Nelson, U.S. Magistrate Judge
                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>   8:19MJ558 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
|        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____         _____<br>                                                           *Executing officer's signature*<br><br>                                 _____<br>                                                          *Printed name and title* |